UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARJORIE FUDALI,<br><br>Plaintiff,<br><br>v.<br><br>PIVOTAL CORPORATION,<br><br>Defendant. | Civil Action 03-1460 (JMF) |

MEMORANDUM OPINION

Currently pending before me is <u>Defendant's Motion For Partial Summary Judgment As To The Amount Of Damages, Or In The Alternative *In Limine* To Preclude Evidence Of Damages In Excess Of A Certain Amount</u> (the "Motion"). For the reasons stated herein, defendant's motion is granted in part and denied in part.

I. BACKGROUND

Plaintiff Marjorie Fudali commenced this action to recover commission payments she asserts her former employer, Pivotal Corporation ("Pivotal"), owes her. Fudali was hired by Pivotal in May 2000 as a Senior Sales Executive. Amended Complaint ("Am. Compl.") ¶¶ 3-5. Fudali resigned, effective June 4, 2002, when Pivotal failed to pay her what she believed to be her due commission. Am. Compl. ¶¶ 6, 25. The central dispute in this case is whether Fudali and Pivotal's then-Chief Financial Officer, Vince Mifsud, entered into an oral agreement in August 2001 regarding Fudali's Fiscal Year 2002 compensation plan. Trial is scheduled to begin on October 22, 2007.

While the central dispute concerns the *percentage* of revenue to which Fudali is entitled in commission, the motion before me concerns the *amount* of revenue that is commissionable. Pivotal and Syngenta Crop Protection AG ("Syngenta") entered into a software licensing and maintenance contract, dated April 25, 2002 (the "Global Agreement"). PIV-MSJ-6. Pivotal argues that, because Fudali's employment with Pivotal was terminated, she is not entitled to commission on any revenue received by Pivotal after 90 days of the Global Agreement. Motion at 10. Pivotal contends that the amount of revenue received before that time is [REDACTED], and that Fudali's damages in this case can be no greater than [REDACTED]. Motion at 9. Though Fudali initially agreed that her damages in this case could be no greater than [REDACTED], she now asserts that her damages far exceed this amount because her commission should have been based not on [REDACTED], but on the full value of the Global Agreement: [REDACTED]. Plaintiff's Supplemental Responses to Defendant's Interrogatories, at 2-3 (Dec. 21, 2003); PIV-MSJ-14.

Three issues must be resolved in Pivotal's favor in order for its motion to be granted in full. First, Pivotal must be correct, as a matter of law, that it received no more than [REDACTED] from Syngenta within 90 days of the Global Agreement. Second, the Compensation Plan[1] must be so unambiguous that there can only be one reasonable interpretation – Pivotal's – concerning whether payments made by Syngenta and received by Pivotal after 90 days of the Global Agreement are commissionable to Fudali. Finally,

---

[1] Pivotal contends that Fudali's commission is governed by the 2002 Global Sales Representative compensation plan, whereas Fudali believes her commission is governed by the 2002 Fiscal Year Standard Sales Executive Compensation Plan. PIV-MSJ-4, PIV-MSJ-5. This dispute need not be resolved here because the parties agree that the Motion can be decided pursuant to identical language contained in both plans under the heading "Incentive Compensation Plan FY 2002" ("Compensation Plan"). PIV-MSJ-5 at PIV0032; Motion at 13; Opp. at 2.

the Compensation Plan must be so unambiguous that there can only be one reasonable interpretation – Pivotal's – concerning whether the Global Agreement contains "extended payment terms."

## II. MATERIAL FACTS NOT IN DISPUTE

1. On April 25, 2002, Pivotal and Syngenta entered into the Global Agreement. PIV-MSJ-6. The final signature on this agreement was affixed on May 20, 2002. PIV-MSJ-6 at 27.

2. Under the Global Agreement, Syngenta was to pay Pivotal a total of [REDACTED] in license fees. Id. at 27. The first payment of [REDACTED] was to be made no later than 15 days from the date of the agreement, and the second payment of [REDACTED] was to be made by January 2, 2003. Id.

3. The agreement also required Syngenta to purchase [REDACTED] in total maintenance and support services for existing and additional software licenses, with a payment schedule extending to January 2, 2006. Id. at 32-33.

4. The payments due under the Global Agreement are represented in the following chart:

| Amount | Due | Source |
|---|---|---|
| License Fees: | | |
| [REDACTED] | 6/4/02 | PIV-MSJ-6 at 27 |
| [REDACTED] | 1/2/03 | PIV-MSJ-6 at 27 |
| Maintenance Fees: | | |
| [REDACTED] | 6/4/02 | PIV-MSJ-6 at 32 |
| [REDACTED] | 1/2/03 | PIV-MSJ-6 at 32 |
| [REDACTED] | 1/2/04 | PIV-MSJ-6 at 32 |

| [REDACTED] | 1/2/05 | PIV-MSJ-6 at 32 |
|---|---|---|
| [REDACTED] | 1/2/06 | PIV-MSJ-6 at 33 |
| **Total:** [REDACTED] | | |

5. On March 15, 2002, Pivotal sent invoice no. 3110036 to Syngenta for software license fees in the amount of [REDACTED]. PIV-MSJ-7. On March 28, 2002, Pivotal sent invoice no. 3110042 to Syngenta for maintenance in the amount of [REDACTED]. PIV-MSJ-8. Payments on these invoices were to be rolled into the Global Agreement. PIV-MSJ-11.

6. The document entitled "Transaction by Customer Inquiry Report" shows entry numbers 3110036 and 3110042 with these same amounts, calculated in Euros ([REDACTED] and [REDACTED]). PIV-MSJ-10.

7. At the bottom of the page there is an entry labeled "Syngenta paid 3110036/3110042," next to the letters "PMT." PIV-MSJ-10. This amount, preceded by a subtraction sign ("-"), is [REDACTED] – the total of entry numbers 3110036 and 3110042 (the disparity of [REDACTED] is presumably the result of currency rate fluctuation). Id.

8. The document entitled "Syngenta Commission Calculation Worksheet" reflects invoices 3110036 ([REDACTED]) and 3110042 ([REDACTED]) as commissionable revenue. PIV-MSJ-13.

9. A document in Microsoft Business Solutions Great Plains format, entitled "Sales Distribution Inquiry Zoom," bears the number 3110055 next to the words "Document No." and shows the total amount [REDACTED] ([REDACTED]) as the

"Originating Amount." PIV-MSJ-12. This amount is $0.10 less than the full potential value of the Global Agreement, as represented in the above chart.

10. The document entitled "Transaction by Customer Inquiry Report" shows an entry number 3110055 with this same amount, [REDACTED]. PIV-MSJ-10. At the bottom of the page there is an entry with this same amount, [REDACTED], next to the letters "RTN." Id. The amount is preceded by a subtraction sign ("-") and above the number appear the words: "May Return." Id. Both entries are dated March 28, 2002. Id.

11. The document entitled "Syngenta Commission Calculation Worksheet" reflects entry 3110055 as commissionable revenue, with an amount of [REDACTED]. PIV-MSJ-13.

12. The document entitled "Transaction by Customer Inquiry Report" shows entries 3110063 and 3110064, dated May 31, 2002, with values of [REDACTED] and [REDACTED]. PIV-MSJ-10. The total value of entries 3110063 and 3110064 is [REDACTED], which, after converting to USD, corresponds to the total amount Syngenta owed pursuant to the Global Agreement, due June 4, 2002 ([REDACTED] in license fees + [REDACTED] in maintenance = [REDACTED]) (see chart above).

13. The document entitled "Transaction by Customer Inquiry Report" contains an entry labeled "syngenta paid 3110063/311006,"[2] next to the letters "PMT," dated June 21, 2002. PIV-MSJ-10 at 2. This amount, preceded by a subtraction sign ("-"), is [REDACTED] – the total of entries 3110063 and 3110064 (the disparity of [REDACTED] is presumably the result of currency rate fluctuation). Id.

14. The document entitled "Syngenta Commission Calculation Worksheet" does

---

[2] Presumably this second number is a typographical error of "3110064."

not reflect entries 3110063 and 3110064. PIV-MSJ-13. There is, however, entry 3110055 with a value of [REDACTED]. PIV-MSJ-13. This amount is just [REDACTED][3] different from the commissionable revenue of entries 3110063 and 3110064.[4]

15. The document entitled "Transaction by Customer Inquiry Report" shows entries 3115004 and 3115005, dated November 30, 2002, with values of [REDACTED] and [REDACTED]. PIV-MSJ-10. These amounts, after converting to USD, correspond to the total amount Syngenta owed pursuant to the Global Agreement, due January 2, 2003 ([REDACTED] = [REDACTED]; [REDACTED] = [REDACTED]). (see chart above).

16. The document entitled "Transaction by Customer Inquiry Report" contains an entry labeled "paid 3115004/3115005," next to the letters "PMT," dated January 22, 2003 (payment of [REDACTED]; disparity of [REDACTED] is presumably the result of currency rate fluctuation). PIV-MSJ-10 at 2.

17. Fudali resigned from Pivotal in May 2002 with an effective date of June 4, 2002. Am. Compl. ¶¶ 6, 25.

### III. LEGAL STANDARD

To prevail on a motion for summary judgment, a party must establish, on the basis of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, that there is "no genuine issue as to any material fact and that the

---

[3] Pivotal does not explain the [REDACTED] discrepancy, and instead uses [REDACTED] and [REDACTED] interchangeably. See, e.g., Motion at 8; Reply at 8.

[4] Syngenta was already paying [REDACTED] for support on existing licenses. PIV-MSJ-11. Because this was a pre-existing obligation, this amount was deducted from the commissionable revenue of

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on such a motion, the Court views the evidence in the light most favorable to the non-moving party. Reeves v. Sanderson Plumbing, 530 U.S. 133, 150 (2000). A party opposing a motion for summary judgment must point to more than just "a scintilla of evidence" supporting his position; "there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

## IV. DISCUSSION

### a. 3110055

Fudali attacks a fundamental premise of the Motion: Pivotal's assertion that it received no more than [REDACTED] from Syngenta under the Global Agreement within 90 days of its enactment. Fudali contends there is a genuine issue of material fact regarding this amount, and further suggests that the true amount is at least [REDACTED].

There is no genuine issue of material fact that Pivotal arrived at [REDACTED] and the amount of revenue commissionable to Fudali in the following manner. First, Pivotal received [REDACTED] in payments from Syngenta on invoices 3110036 and 3110042 on April 24, 2002. PIV-MSJ-10. These payments were "rolled into" the Global Agreement. PIV-MSJ-11. This amount was credited to Fudali as commissionable revenue, and was entered on the Commission Calculation Worksheet along with the corresponding invoice numbers 3110036 and 3110042. PIV-MSJ-13.

---

entries 3110063 and 3110064. Motion at 8. Consequently, Fudali's commissionable revenue from those

Next, Pivotal received [REDACTED] in payments from Syngenta on invoices 3110063 and 3110064 on June 21, 2002. PIV-MSJ-10. These payments included [REDACTED] in maintenance and support payments for licenses pre-dating the Global Agreement. PIV-MSJ-6 at 27, 32; PIV-MSJ-11. Deducting [REDACTED] from [REDACTED], Pivotal credited [REDACTED][5] to Fudali as commissionable revenue from these payments. For an unknown reason, this amount was entered on the Commission Calculation Worksheet along with the number 3110055 rather than the corresponding invoice numbers 3110063 and 3110064. PIV-MSJ-13.

This same number, 3110055, appears in the document entitled "Transaction by Customer Inquiry Report" ("Inquiry Report") where it is assigned the value of [REDACTED], the full potential value of the Global Agreement. PIV-MSJ-6 at 27, 32. Though this entry is similar in appearance to those entries that represent invoices sent to Syngenta, Pivotal asserts that no such invoice was ever sent. Reply at 8; compare PIV-00990 ("Historical Record") with PIV-MSJ-7 ("Invoice"). Pivotal points out that 3110055 was reversed on the same day it was entered, and explains it as an "invoice numbering error." Reply at 6-8; PIV-MSJ-10 (reflecting [REDACTED] preceded by a subtraction sign ("-"), next to the letters "RTN," and below the words "May Return.").

Fudali seizes upon these references to 3110055 as support for her argument that a genuine issue of material fact exists over how much revenue was received by Pivotal from Syngenta. Opp. at 15-16. She goes further, however, by asserting that there was an actual invoice 3110055 that "was sent to Syngenta on or about April 30, 2002 when Ms. Fudali was still an employee there and would have been paid shortly thereafter and within

---

entries was [REDACTED] + [REDACTED] - [REDACTED] = [REDACTED].
[5]   As noted, the number should be [REDACTED].

the 90 days after Plaintiff left Pivotal." Opp. at 11 n.2; PIV-MSJ-14. She claims that Pivotal employee James Montano "stated that commissions could have been paid had Syngenta made a payment pursuant to Invoice 3110055." Opp. at 15. The latter statements is said to be based on page 106 of Montano's deposition. But, an examination of Montano's deposition indicates that he consistently refused to admit that there ever was an invoice 3110055 for he had never seen such an invoice that was in the form that was used to be sent to a client nor any invoice sent to Syngenta that bore that number 3110055. Montano Dep. at 106-107. Thus, at no point did Montano ever say "that commission could have been paid had Syngenta made a payment pursuant to Invoice 3110055." Opp. at 15. He persistently refused to admit that invoice 3110055 existed. Id. at 106-115.

Fudali can not defeat Pivotal's motion for summary judgment merely by showing some possibility of an existential doubt as to whether she was paid what she was due. Instead she must point to "evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. Fudali claims that she is owed commission on the full [REDACTED] that she characterizes as "the actual amount of invoice number 3110055." PIV-MSJ-14. Thus, she must provide evidence upon which a jury could premise the conclusion that at one point Pivotal sent Syngenta an invoice for that amount and Syngenta paid it. There is no such evidence; there is at best a doubt as to why the number 3110055 appears on the Inquiry Report and Commission Calculation Worksheet but no evidence anywhere that Syngenta was billed and paid this amount.

To the contrary, the only evidence is of the payments made by Syngenta that are reflected on the Inquiry Report and the Commission Calculation Worksheet. There is

simply no reason – and Fudali does not attempt to provide one – why Pivotal and Syngenta would deviate from the payment schedule they had set forth in the Global Agreement less than one week earlier. Nor can Fudali explain why Syngenta would voluntarily pre-pay each and every item ([REDACTED]) listed in the payment schedule, only to pay for those same items once again as they came due.[6] Indeed, Pivotal has provided evidence that Syngenta made four payments (invoices 3110063/3110064 and 3115004/3115005) in accordance with the payment schedule; these payments would have been redundant if, as Fudali contends, Syngenta had already paid [REDACTED] under the Global Agreement. Perhaps Syngenta was so awash in cash that it blindly submitted payment on any invoice that came in its door, even if that invoice was for more than nine million Euros and ran counter to an agreement it entered into earlier in the week. If such a strange proposition were true, however, Fudali certainly has provided no evidence to support it.

As a matter of law, then, defendant's motion will be granted insofar as there is no genuine issue of material fact over whether Pivotal was paid any more than [REDACTED] from Syngenta pursuant to the Global Agreement within 90 days of its enactment.

### b. Ambiguity

The dispute over how much revenue was received by Pivotal from Syngenta within 90 days of the Global Agreement presumes the answer to be relevant to the calculation of Fudali's commission under the Compensation Plan. This is not necessarily the case. Pivotal asserts that Paragraph 12 (Termination) of the Compensation Plan

---

[6] Indeed, Fudali would receive a partial double recovery if allowed to recover commission based upon the full value of the Global Agreement while retaining the commission Pivotal has already paid her.

modifies Paragraph 6.2 (Payment of Commission/Grant of Credit) such that Fudali is only entitled to commission based upon revenue received by Pivotal from Syngenta under the Global Agreement within 90 days of its enactment. Fudali, in turn, contends that the Compensation Plan is ambiguous as to the impact of an employee's termination on the payment of commission. Opp. at 9-13.

The question of whether a contract is ambiguous is a question of law that may be decided on a motion for summary judgment. See Republican Nat. Comm. v. Taylor, 299 F.3d 887, 892 (D.C. Cir. 2002) ("Where, as here, [n]one of the parties ... contends that extrinsic evidence is at issue, but instead the parties merely present[ ] two competing versions of what [they] intended by the disputed language, the contract's meaning is a question for the court to decide.") (citation and quotation omitted). A contract is ambiguous only when "the contract is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." Gryce v. Lavine, 675 A.2d 67, 69 (D.C. 1996) (citations and quotations omitted).

The general rule governing commissions is set forth in Paragraph 6.2 of the Compensation Plan, which states in relevant part:

> 6.2. Payment of Commission/Grant of Credit
>
> Quota credit is given and commissions are earned when a license agreement or, if an existing customer, a purchase order is signed. Commissions are payable monthly after Pivotal's receipt of a signed license agreement or, if an existing customer, a purchase order and otherwise based upon the following:
>
> (a) 50% upon Pivotal's receipt of the signed license agreement or purchase order; and
> (b) the remaining 50% of commission is payable to you upon Pivotal's receipt of full payment from the customer.

UNLESS:

    (c) where there are extended payment terms and the last payment is more than 6 months after the date of the license agreement or purchase order, in which case, you will be granted quota credit and paid commission for the net present value of the commissionable fees calculated at an effective interest rate of 20% upon Pivotal's receipt of the first payment made to Pivotal by the customer.

Compensation Plan ¶ 6.2.

Paragraph 12 of the Compensation Plan states in relevant part:

12. <u>Termination</u>

In the event you leave Pivotal for any reason, payment of commissions owed to you will be paid to you as follows:
1. Commissions will be payable in accordance with this plan on transactions where Pivotal receives a license agreement or, if an existing customer, a purchase order on or before the last day of your employment.
2. Commission payments due to you will be paid you in accordance with the rules set out above, and in particular only 50% payments will be made to you until full payment has been made to Pivotal by the customer. There will be no acceleration of future commission payments upon termination.
3. In the event a customer does not pay Pivotal within 90 days of the date of the license agreement or purchase order, you will not receive any commission payment.

Compensation Plan ¶ 12.

As an initial matter, it is clear that Paragraph 12 is not relevant to this dispute if the Global Agreement contains extended payment terms.[7] This is because Paragraph 12 only becomes applicable to terminated employees who have "payments of commission owed to [them]." Fudali would not have been "owed" any commission if the Global Agreement contained extended payment terms because, upon Pivotal's receipt of the first

---

[7] The parties dispute whether the Global Agreement contains extended payment terms. This is discussed in greater detail below.

payment from Syngenta under the Global Agreement, Fudali would have been entitled to payment on all of the commission due her.[8]

Paragraph 12 is relevant to this dispute if the Global Agreement did not contain extended payment terms. Under that scenario, Fudali would have been entitled to payment on 50% of her commission upon Pivotal's receipt of the signed Global Agreement.[9] Compensation Plan ¶ 6.2(a). The remaining 50% of her earned commission would be payable upon Pivotal's receipt of full payment from Syngenta. Id. at ¶ 6.2(b). Because Fudali left *after* Pivotal had received the signed Global Agreement but *before* Pivotal received full payment from Syngenta, she was "owed" commission upon her departure and Paragraph 12 is applicable.

Fudali argues that Paragraph 12 is inapplicable to Paragraph 6.2 because, unlike Paragraph 12, "[n]o where (sic) in Paragraph 6.2 does it mention the termination of commission payments should Pivotal receive payments from Syngenta after 90 days of the person's resignation." Opp. at 13. See also Opp. at 10 ("In fact, Paragraph 6.2 does not discuss any elimination of commission due to termination. Rather, it sets forth a payment scheme for commissions and discusses with specificity those commission payments made depending upon the payments made by the purchaser."). She also argues that Paragraph 12 cannot modify Paragraph 6.2 because "Paragraph 6.2 governs the Payment of Commission and the Grant of Credit, and it does not make any reference to Paragraph 12 governing Termination." Opp. at 10.

---

[8] Under this scenario, if Syngenta did not make all payments under the Global Agreement, an issue would arise whether Paragraph 6.3 of the Compensation Plan applies to terminated employees such that Fudali would have to return any portion of her commission based upon payments from Syngenta that were never made.

[9] The final signature on this agreement was affixed on May 20, 2002. PIV-MSJ-6 at 27.

To the extent that Fudali is contending that an ambiguity exists merely because two contractual provisions address the same subject without reference to each other, Fudali's argument is not persuasive. Fudali's argument, taken to its logical conclusion, would not only eviscerate every commission-related clause in the Compensation Plan other than Paragraph 6.2 – it would create ambiguity in nearly every contract ever created that contained more than one clause covering the same subject. This runs counter to a fundamental rule of contract construction: "[a] contract is construed as a whole, giving effect to all of the contract's provisions and avoiding a construction which would render one of those provisions meaningless." Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 235 (D.D.C. 1996).

Fudali's argument might have merit if Paragraph 6.2 provided a different course of action than Paragraph 12 in the event of an employee's termination. To the contrary, however, Paragraph 6.2 is silent on termination and coexists in harmony with Paragraph 12 because, whereas Paragraph 6.2 governs the universe of Pivotal employees earning commission, Paragraph 12 governs a subset of that universe: employees who are owed commission but who are no longer employed by Pivotal. "[W]here both the specific and general provisions may be given reasonable effect, both are to be retained." Ohio Power Co. v. F.E.R.C., 744 F.2d 162, 168 n.7 (D.C. Cir. 1984).

Just because these two provisions may be given reasonable effect, however, does not close the case on ambiguity. To the contrary, Paragraph 12 requires further scrutiny. There are two clauses in Paragraph 12 that potentially speak to our facts. The first is not in dispute: Fudali was not entitled to an acceleration of the commission owed to her merely because she was departing. The second clause, however, has been the subject of

considerable contention:

> In the event a customer does not pay Pivotal within 90 days of the date of the license agreement or purchase order, you will not receive any commission payment.

Id. at ¶ 12 (the "Clause").

Pivotal believes that the Clause precludes Fudali from receiving commission from any revenue that was not received by Pivotal from Syngenta within 90 days of the Global Agreement. For this interpretation to be true, however, one must read the Clause to say: "Only those payments made by Syngenta to Pivotal within 90 days of the date of the Global Agreement are commissionable to Fudali." This interpretation would significantly alter the payment structure of Paragraphs 6.2(a) and 6.2(b), which set forth that: (1) 50% commission is payable to Fudali upon receipt by Pivotal of the Global Agreement; and (2) the remaining 50% commission is payable to Fudali upon full payment by Syngenta. In fact, the Clause could just as easily be read to preclude only this second payment from being paid to Fudali because Syngenta did not make full payment within 90 days of the Global Agreement. Similarly, it could be read to apply only if Syngenta had not made *any* payment to Pivotal within 90 days of the Global Agreement. Under that interpretation, the Clause would be inapplicable to Fudali because we know that Syngenta *did* make such a payment. Indeed, these are only some of the possible interpretations.

The possibility of more than one reasonable interpretation of the Clause creates a genuine issue of material fact that can only be resolved by a jury. Harbor Ins. Co. v. Schnable Found. Co., 946 F.2d 930, 934 n.1 (D.C. Cir. 1991), cert. denied 504 U.S. 931 (1992) ; Farmland Industries, Inc. v. Grain Board of Iraq, 904 F.2d 732, 736 (D.C. Cir.

1990); E. P. Hikel & Co. v. Manhattan Co., 506 F.2d 201, 204 (D.C. Cir. 1974); Nationwide Mut. Ins. Co v. Nat'l Reo Management Inc., 205 F.R.D. 1, 9 (D.D.C. 2000), appeal dismissed, 2004 WL 344111 (D.C. Cir. Feb. 20, 2004) citing Howard Univ. v. Best, 484 A.2d 958, 966 (D.C. 1984).

### c. Extended Payment Terms

The disputed question of whether the Global Agreement has "extended payment terms" is of great importance to this case because the answer determines which of two commission schemes are applicable to Fudali. Compare Compensation Plan ¶¶ 6.2(a) and 6.2(b) with ¶ 6.2(c). Whereas Pivotal asserts that the Global Agreement does not contain "extended payment terms," Fudali is just as adamant that it does.

The determination of whether the Global Agreement contained "extended payment terms" is hampered by the lack of a definition for that phrase in the Compensation Agreement. Pivotal's corporate representative, James Montano, testified at his deposition that the phrase might refer to agreements pursuant to which products are delivered to a customer on credit for payment at a later date. Montano Dep. at 16:13-17:12. A careful reading of his deposition indicates that he never specifically indicated that the Global Agreement did not contain extended payment terms; he certainly did not dismiss the idea that it did out of hand. Id. at 16-18. At one point, he even indicated that he had "never seen extended payment terms." Id at 16. He also indicated that reviewing the schedule of proposed deliveries to Syngenta under the contract would be "one way to approach" the question of whether the contract contained extended payment terms. Id. at 17-18.

Fudali, for her part, cites to the Global Agreement's schedule of "Maintenance

and Support Rates" to which Montano referred as a way of approaching the term "extended payment terms" and states that "[t]he Pivotal-Syngenta contract has extended payment terms." PIV-MSJ-6 at 32; Opp. at 11. Since the schedule attached to the agreement itself contains payments over a period of time and Montano never specifically rejected the contention that it did, and because Montano also testified that: (1) he had never seen "extended payment terms," and (2) the schedule of deliveries and payments might be an approach to defining "extended payment terms," I must find that this term is ambiguous and its meaning must be resolved by a jury.

## Conclusion

For the reasons explained, I find that: (1) as a matter of law, Pivotal received no more than [REDACTED] from Syngenta under the Global Agreement within 90 days of its enactment; (2) Paragraph 12 of the Compensation Plan is ambiguous such that its interpretation must be resolved by a jury; and (3) there is insufficient evidence to establish, as a matter of law, that the Global Agreement has "extended payment terms." Defendant's motion will therefore be granted in part and denied in part.

An Order accompanies this Memorandum Opinion.

_____/s/_____<br>
JOHN M. FACCIOLA<br>
UNITED STATES MAGISTRATE JUDGE

Dated: October 15, 2007